## Commonwealth vs. Nathan J. Ruell.

Hampshire. November 5, 2010. - March 14, 2011.

Present: Ireland, Spina, Botsford, & Gants, JJ.

*Homicide. Due Process of Law. Evidence,* Exculpatory, Expert opinion. *Witness,* Expert. *Jury and Jurors. Practice, Criminal,* Jury and jurors, Challenge to jurors, Capital case.

There was no merit to a criminal defendant's claim that the evidentiary standard for the admissibility of third-party culprit evidence violated his due process rights provided by the Fourteenth Amendment to the United States Constitution. [130-133]

At a murder trial, the judge did not err in excluding certain third-party culprit evidence, where in each instance the judge carefully weighed the probative value of the proferred evidence and the risk of unfair prejudice to the Commonwealth from the admission of such evidence. [133-135]

At a murder trial, there was no abuse of discretion in the admission in evidence of expert testimony by the medical examiner of her opinion as to the type of weapon that was consistent with the type of injuries suffered by the victim, where her training and experience allowed her to offer such an opinion [135-136]; further, the judge did not err in allowing the medical examiner to show the jury a drywall hammer, where, given that the medical examiner made clear that she purchased the hammer earlier, there was no risk the jury would mistakenly think it was the murder weapon, and where the hammer allowed her to show the jury the qualities of a weapon consistent with the type of injuries inflicted [136].

At a criminal trial, the judge did not abuse his discretion in denying the defendant's challenges for cause of certain prospective jurors. [136-138]

Indictments found and returned in the Superior Court Department on December 5, 2006.

The cases were tried before *Judd J. Carhart,* J.

*Ruth Greenberg* for the defendant.

*Elizabeth Dunphy Farris,* Assistant District Attorney, for the Commonwealth.

Gants, J. On October 10, 2005, Sylvia Mazur discovered the body of her eighty-three year old mother, Rose Ann Martowski (victim), on the sofa of her mother's home in Ware. The victim's

skull had been fractured so severely that the entire right side of her skull had collapsed, leaving her brain exposed and her face bloodied. The home had been ransacked, and the victim's jewelry and cash were gone. A fire had been set on the bed in the victim's bedroom, but it had extinguished itself. A jury in the Superior Court convicted the defendant of murder in the first degree on theories of deliberate premeditation, extreme atrocity or cruelty, and felony-murder, and of armed burglary and arson.[1] On appeal, the defendant argues that he should be granted a new trial because the trial judge erred by (1) improperly barring third-party culprit evidence; (2) admitting in evidence the medical examiner's opinion as to the type of weapons that were consistent with the victim's injuries; and (3) denying four of the defendant's challenges for cause during jury selection. We conclude that the judge did not err in any of these rulings, and affirm the defendant's convictions. After a complete review of the record, we also conclude that there is no basis to exercise our power under G. L. c. 278, § 33E, to reduce his murder conviction to a lesser degree of guilt or to order a new trial.

*Background.* Because the defendant does not challenge the sufficiency of the evidence, we provide only a summary of the evidence, viewed in the light most favorable to the prosecution, reserving certain details for our analysis of the issues raised on appeal.

Frank Gurka hired the defendant between September 7 and September 11, 2005, to help him load and sell antiques and collectibles at the Brimfield Fair. On September 17, Gurka and his wife returned from another antiques fair at approximately 11 P.M. and went to bed. The next morning, Gurka discovered that the

---

[1]The defendant also was convicted of unarmed burglary and larceny under $250 for breaking and entering the Ware home of Frank Gurka and stealing cash and a glass collectible bottle during the evening of September 17 and 18, 2005. The defendant was found not guilty of an attempted burglary on October 10, 2005, at the Gurka residence. The defendant was sentenced to life imprisonment without the possibility of parole on the murder conviction, and from twenty to thirty years in the State prison on the armed burglary conviction, to be served from and after his life sentence for murder. He was also sentenced to from eighteen years to twenty years on the arson and unarmed burglary convictions, and one year in a house of correction on the misdemeanor larceny conviction, each to be served concurrently with each other and with the sentence for armed burglary from and after the life sentence.

bathroom window and screen in his home had been opened, approximately $150 in cash had been removed from a money pouch in the parlor, and a collectible bottle commemorating the flight of Apollo 15 was missing. On July 21, 2006, the defendant gave the Apollo 15 collectible bottle as a birthday present to his friend, Joseph Brown.

At approximately 5 P.M. on October 9, 2005, the victim's next door neighbor, ninety-four year old Sophie Cloutier, saw a man stare for about ten minutes at the rear of the victim's house.[2] That night, she saw a "smoky" light in the victim's home, which was unusual because she had never seen lights that late at night in the victim's home. Later that day, after the victim's body had been discovered and the police had secured the crime scene, the police observed that the kitchen window above the sink in the victim's home was open, there was a footwear impression at the base of the kitchen window, and an unsmoked Camel "wide filter" cigarette was lodged between the screen and window. The defendant smoked Camel wide cigarettes. The cigarette was sent for deoxyribonucleic acid (DNA) testing, which revealed a partial male DNA profile from a single source that matched the defendant's DNA profile. The probability of another randomly selected individual besides the defendant having the same DNA profile was approximately one in 6.242 billion of the Caucasian population, one in 2.737 billion of the African-American population, and one in 2.492 billion of the Hispanic population. When interviewed by the police, the defendant said that he did not know where the victim's residence was located, and that there was no reason why his DNA might be inside that house.

The victim had no checking account and paid her bills with money she kept in her handbag. Approximately three weeks before her death, the victim had an estimated $3,000 in cash, much of it in one hundred and fifty dollar denominations, and

___

[2]At trial, an identification procedure was conducted in which the defendant was seated with spectators in the rear of the court room and Sophie Cloutier left the witness stand and walked to the rear of the court room to see if she could identify the person she had seen from a distance staring at the victim's home. Cloutier said, "Maybe that one over there. . . . The second one," indicating the defendant, but then added, "I don't know if it's true or not . . . I didn't see him that close."

was scheduled to receive her monthly Social Security check at the beginning of October. The handbag with the cash was gone when her body was discovered.

The defendant, who was unemployed at the time of the victim's death but a frequent user of cocaine, marijuana, and other drugs, had a "good-size wad of money" on the morning of October 11, 2005, and used a one hundred dollar bill to purchase video game products. About a week before Halloween in 2005, the defendant gave a bracelet to a friend, and showed her a green metal box containing other jewelry that the friend described as "[w]hat an older woman would wear . . . something my grand-mother would have." Two days later, he told her that he had won about $3,000 on a "scratch ticket" and carried a wad of twenty dollar bills. Later in the fall of 2005 he purchased one-quarter pound of "the next step up type of" marijuana, costing approximately $900, which he paid with fifty and one hundred dollar bills; he had been purchasing twenty or forty dollar bags of lesser quality marijuana in the summer and early fall of 2005. The defendant late that fall also purchased one-half ounce of cocaine for $400.

In a house of correction awaiting trial, the defendant admitted to one detainee that he had broken into a home in Ware and beat an "old lady" to death. He boasted that breaking and entering was an "art form," that he was very skilled and well prepared, that he always entered through a window, and that he always wore a hat and gloves to avoid leaving any evidence behind.[3] He said that he knew the victim and she knew him; that he took some money, coins, jewelry, and an old jewelry box; and that, after "whacking" her, he gathered some papers, poured perfume over them, lit them, and left.[4] He said his only mistake was in leaving the cigarette, which he had used to hold up the window screen.[5]

---

[3]The only forensic evidence left behind in the burglaries of the Gurka residence and the victim's home that linked the defendant to the crimes was the unsmoked cigarette lodged between the screen and kitchen window of the victim's home.

[4]On or around the burnt bed, the police found various papers, including binders from a coin collection, and perfume bottles with the stoppers removed.

[5]The defendant also told a friend in June, 2006, that, if he were to be seen by a resident of a home while he was committing a burglary, "I'd kill them like I killed the old lady in Ware."

The defendant told another detainee that he had burned holes through the window screen with a cigarette to get through the window, that the woman approached him, that he got scared and hit her in the head several times with a hammer, and that he later threw the hammer into a lake or stream in the back of her home.[6]

*Discussion.* 1. *Third-party culprit evidence.* The defendant contends that the judge erred in excluding third-party culprit evidence regarding four individuals who could have committed the crimes charged, alone or together: Joseph Brown, Gregory Babb, Richard Chartier, and Kenneth Kowalski.

We declared in *Commonwealth* v. *Silva-Santiago*, 453 Mass. 782, 800-801 (2009):

"Third-party culprit evidence is 'a time-honored method of defending against a criminal charge.' *Commonwealth* v. *Rosa*, 422 Mass. 18, 22 (1996). 'A defendant may introduce evidence that tends to show that another person committed the crime or had the motive, intent, and opportunity to commit it.' *Commonwealth* v. *Lawrence*, 404 Mass. 378, 387 (1989), quoting *Commonwealth* v. *Harris*, 395 Mass. 296, 300 (1985). We have given wide latitude to the admission of relevant evidence that a person other than the defendant may have committed the crime charged. 'If the evidence is "of substantial probative value, and will not tend to prejudice or confuse, all doubt should be resolved in favor of admissibility." ' *Commonwealth* v. *Conkey*, 443 Mass. 60, 66 (2004), quoting *Commonwealth* v. *Keizer*, 377 Mass. 264, 267 (1979). Yet, this latitude is not unbounded. The limitations are twofold. First, because the evidence is offered for the truth of the matter asserted — that a third party is the true culprit — we have permitted hearsay evidence that does not fall within a hearsay exception only if, in the judge's discretion, 'the evidence is otherwise relevant, will not tend to prejudice or confuse the jury, and there are other "substantial connecting links" to the crime.' *Commonwealth* v. *Rice*, 441 Mass. 291, 305

---

[6]The defendant's description did not accurately reflect the forensic evidence from the crime scene. The cigarette that was found between the screen and window was unsmoked, and there were no burn marks on the screen. The victim was found dead on the sofa in her living room and the bloodstain analysis indicated that she was reclining when she was repeatedly struck in the head with a weapon.

(2004), quoting *Commonwealth* v. *O'Brien*, 432 Mass. 578, 588 (2000). Second, the evidence, even if it is not hearsay, 'must have a rational tendency to prove the issue the defense raises, and the evidence cannot be too remote or speculative.' *Commonwealth* v. *Rosa, supra.* Each of these limitations recognizes that the admission of feeble third-party culprit evidence poses a risk of unfair prejudice to the Commonwealth, because it inevitably diverts jurors' attention away from the defendant on trial and onto the third party, and essentially requires the Commonwealth to prove beyond a reasonable doubt that the third-party culprit did not commit the crime. See *id.*"

The defendant claims that this evidentiary standard for the admissibility of third-party culprit evidence violates the standard established by the United States Supreme Court in *Holmes* v. *South Carolina*, 547 U.S. 319 (2006) (*Holmes*), under the due process clause of the Fourteenth Amendment to the United States Constitution. In *Holmes*, the Court set forth two "widely accepted" formulations of "rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged." *Id.* at 327. The two formulations provide:

> "Evidence tending to show the commission by another person of the crime charged may be introduced by [the] accused when it is inconsistent with, and raises a reasonable doubt of, his own guilt; but frequently matters offered in evidence for this purpose are so remote and lack such connection with the crime that they are excluded."

*Id.*, quoting 41 C.J.S., Homicide § 216, at 56-58 (1991).

> "[T]he accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged . . . . [Such evidence] may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial."

*Holmes, supra,* quoting 40A Am. Jur. 2d, Homicide § 286, at 136-138 (1999).[7]

We see nothing in either of these two "widely accepted" formulations of the evidentiary standard for the admissibility of third-party culprit evidence that is inconsistent with our standard. All consider whether the third-party culprit evidence tends to prove that someone other than the defendant committed the crime, or whether the evidence is speculative, remote, or lacks any connection with the crime charged.

The defendant, however, contends that our standard is unfair because it admits a defendant's exculpatory third-party culprit evidence only where it is of "of substantial probative value, and will not tend to prejudice or confuse," *Commonwealth* v. *Keizer, supra,* quoting *Holt* v. *United States,* 342 F.2d 163, 166 (5th Cir. 1965), while a prosecutor's inculpatory evidence is admitted unless "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, being unnecessarily time consuming, or needless presentation of cumulative evidence." Mass. G. Evid. § 403 (2010), and cases cited. There is no evidentiary double standard and, consequently, no unfairness. Where evidence is otherwise admissible, "[n]ormal relevancy considerations apply in determining the admissibility of evidence that someone else committed the crime." *Commonwealth* v. *Conkey, supra.* See *Commonwealth* v. *Jewett,* 392 Mass. 558, 562 (1984). In *Commonwealth* v. *Keizer, supra,* we said that "all doubt should be resolved in favor of admissibility" of the third-party culprit

---

[7] In *Holmes* v. *South Carolina,* 547 U.S. 319 (2006) (*Holmes*), the defendant proffered evidence at a pretrial hearing that a third party was in the victim's neighborhood at the time of the assault, and had told four other witnesses that he committed the crimes or knew that the defendant was innocent of those crimes. *Id.* at 323. The South Carolina Supreme Court affirmed the trial judge's exclusion of this evidence because there was such strong evidence of the defendant's guilt that the proffered evidence did not raise a reasonable inference as to the defendant's innocence. *Id.* at 323-324. The United States Supreme Court vacated the defendant's convictions and remanded the case for a new trial, concluding that the admission of third-party culprit evidence depends on the probative value of the exculpatory evidence and the risk of prejudice or confusion, not the strength of the prosecution's evidence. *Id.* at 329-331. As will be shown, the probative value of the proffered evidence in the instant case falls far short of the probative value of the evidence in *Holmes.*

evidence where "the proffered evidence is of substantial proba-
tive value, and will not tend to prejudice or confuse." *Id.,* quot-
ing *Holt* v. *United States, supra.* The same could be said about
prior bad act evidence offered against a defendant.

Applying this standard to our independent review, we evalu-
ate separately the defendant's claim of error as to each alleged
third-party culprit. See *Commonwealth* v. *Conkey, supra* at
66-67 ("Because the issue is one of constitutional dimension,
we are not bound by an abuse of discretion standard, but rather
examine the issue independently"). The jury heard substantial
evidence regarding Brown. They learned that Brown was the
defendant's friend, that the Apollo 15 bottle stolen from the
Gurka residence was retrieved from Brown's residence on
September 7, 2006, and that the defendant in the summer of
2005, after asking someone at a party to help him break into a
house in East Longmeadow, left the party that night with Brown.
They also learned that a DNA sample was taken from Brown
and that he was excluded as a source of the DNA profile found
on the cigarette. The only evidence that the defendant contends
the judge erred in excluding was that Brown was interviewed
about the Gurka burglary, which would suggest that he was a
suspect in the burglary based on his possession of the Apollo 15
collectible bottle.[8] The fact that a third party was a suspect in
the police investigation is not evidence that the third party com-
mitted the crime, just as the prosecutor's decision to seek an
indictment against the defendant is not evidence that the defend-
ant committed the crime. The judge did not err in excluding this
evidence.

The jury heard even more evidence as to Babb. The jury
learned that he lived next door to the victim's residence, in the
same house as Sophie Cloutier, that he was alone with Cloutier
on the evening of October 10, 2005, and that he smoked. The
jury also learned that a DNA sample was taken from Babb and
that he, too, was excluded as a source of the DNA profile found
on the cigarette. In addition, the jury learned that shoes were
taken from his residence and eliminated as the source of the
footwear impression left beneath the victim's open kitchen

---

[8]Joseph Brown was charged with receiving stolen property based on his
receipt of the Apollo 15 collectible bottle.

window; that fingerprints were taken from him and did not match any of the latent fingerprints found in the victim's residence; that a hatchet in Babb's residence found near a wood pile tested negative for blood; that he was interviewed during the course of the criminal investigation; and that, when his hands were tested for the presence of blood on October 10, 2005, the test did not reveal the change in color that suggested the presence of blood.[9] The defendant claims that the judge erred in refusing to let Joyce Bousquet, one of the victim's daughters, testify that the police considered Babb a suspect, that her mother had been nervous about Babb, or that she had heard that Babb had a criminal record and had been in jail.[10] We conclude that the judge did not err in excluding this evidence.

As to Chartier, the jury learned only that his known DNA sample was excluded as a source of the DNA profile found on the cigarette, and that he was interviewed during the investigation. The defendant argues that the judge erred by barring him from eliciting from Sergeant Christopher Wilcox of the State police, who traveled to Georgia to interview him, that Chartier admitted to smoking Camel wide filter cigarettes, had a warrant lodged against him by the United States Army, carried a small hatchet for his work at a paper mill, had lost between $400 and $500 each month in "online gambling," and said during the interview with Sergeant Wilcox that he figured the State trooper was there because of the murder in Ware. This evidence, considered collectively, is not of probative value in suggesting Chartier's guilt. While Chartier may smoke the same type of cigarette found at the scene, the defendant's DNA, not Chartier's, was found on that particular cigarette. A small hatchet is not so unique a tool that its possession would suggest Chartier's responsibility for the victim's death. Nor would his alleged violation of the military code, or his financial problems, reasonably suggest that he was the killer. And it did not suggest consciousness of guilt that Chartier figured that the well-publicized murder of an elderly

---

[9]The jury properly did not learn that the defendant sought to call Gregory Babb as a witness, that his attorney informed the judge that Babb intended to invoke his rights under the Fifth Amendment to the United States Constitution, and that the judge, after an ex parte side bar conference (the transcript of which was impounded), ruled that Babb had a valid Fifth Amendment privilege.

[10]Joyce Bousquet testified that she knew Babb by name only.

woman in Ware was the reason why a State trooper traveled to Georgia to interview him. The judge did not err in excluding this evidence.

As to Kenneth Kowalski, the defendant claims that the judge erred in barring evidence that Kowalski's girl friend was a known "crack" cocaine addict and that he walked out of his interview with Sergeant Wilcox after the trooper accused him of killing the victim to support her drug habit. A State trooper's suspicion is not probative evidence of guilt, nor, standing alone, is speculation that Kowalski committed the burglary of the victim's home because he needed money to buy drugs for his girl friend. There was no error in excluding this evidence.

In sum, we conclude that the judge carefully evaluated the probative value of the proffered third-party culprit evidence and the risk of unfair prejudice to the Commonwealth from the admission of such speculative and remote evidence, and correctly ruled that the evidence was not admissible.

2. *Admission in evidence of medical examiner's opinion as to the type of weapons that were consistent with the victim's injuries.* Dr. Joann Richmond, the medical examiner who conducted the autopsy of the victim, testified that the nature of the victim's wounds "tells me that the edge of the weapon that cut this piece of tissue was thick and somewhat dull; not like a scalpel, not like a knife; something that would be thicker and duller so that the edges of the tissue are scraped and not surgically cut. . . . It would be something more along the lines of perhaps a small axe or hatchet." Later, when asked for her opinion as to the types of weapons that would be consistent with the victim's injuries, Dr. Richmond, over objection, stated that the "type of weapon used would be something along the lines of a machete, a small hand axe, some type of meat cleaver." She later testified, also over objection, that she observed and purchased at a Home Depot store a drywall hammer, whose heaviness and sharp edge was consistent with the pattern of injuries she observed on the victim. She showed the jury the drywall hammer, which was marked for identification but not offered in evidence.

The defendant argues that the judge abused his discretion in admitting this evidence, because no weapon linked to the murder was found and the medical examiner's opinion was mere spec-

ulation. We disagree. The expert's training and experience al-
lowed her to offer an opinion as to the type of weapon that was
consistent with the type of injuries suffered by the victim. Where
the prosecution offered evidence that the defendant had access
to a drywall hammer in 2005 and had an axe and a ball peen
hammer in his room when his parents' residence was searched
on September 22, 2006, evidence that these types of tools were
consistent with the injuries inflicted on the victim was relevant
and not unfairly prejudicial. See *Commonwealth* v. *James*, 424
Mass. 770, 779 (1997) (possession by defendant of instrument
capable of being used in commission of crime admissible without
direct proof that instrument was the one used).

Nor did the judge err in allowing the expert to show the jury
a drywall hammer. Dr. Richmond made clear that she had pur-
chased the drywall hammer a couple of weeks earlier; there was
no risk that the jury would mistakenly think that her drywall
hammer was the murder weapon. The drywall hammer allowed
her to show the jury the qualities of a weapon consistent with
the type of injuries inflicted. The judge acted well within his
discretion in concluding that the jury would benefit from such
an illustrative example, and that the benefit exceeded the risk of
unfair prejudice.

3. *Denial of the defendant's challenges for cause.* The defend-
ant claims that the judge erred in denying four challenges for
cause during jury selection, and that the error requires a new
trial because the defendant exhausted his peremptory challenges
on jurors who should have been excused for cause. A judge has
broad discretion in deciding whether a prospective juror is
impartial, and his decision will be reversed only for an abuse of
discretion. *Commonwealth* v. *Auguste*, 414 Mass. 51, 56-57
(1992). We conclude the judge properly exercised his discretion.

We address each of the cause challenges separately. Juror no.
118, when he was a law student, served as an intern in an elder
care unit of a legal services office, where he heard "some stories
of elder abuse." He was sympathetic toward the elderly and, as
an attorney, devotes part of his practice to helping them with
matters involving Social Security and "MassHealth" applica-
tions. A member of his family had been raped. The judge
questioned him as to each of these matters and the prospective

juror declared that none would affect his ability to be fair in this case. The judge acted within his discretion in finding the juror honest and concluding that he would be fair and unbiased. See *Commonwealth* v. *Leahy,* 445 Mass. 481, 494 (2005) ("jurors' assertions of impartiality should be accepted by the judge unless extraordinary circumstances give some reason to question such assertions"). The fact that the juror sympathized with the elderly and that a family member has been a victim of violence does not suggest that he would not be fair in deciding whether the Commonwealth met its burden of proving beyond a reasonable doubt that the defendant committed the crimes charged.

Juror no. 49 characterized the crime as "reprehensible" but "absolutely" agreed that the reprehensible nature of the crime "has nothing to do with the issue of whether this defendant is guilty or not guilty," and assured the judge he could be fair. Because the issue at trial was whether the defendant committed the murder, not whether the killing of an elderly woman in her home is reprehensible, the judge correctly denied the challenge for cause.

Juror no. 12 was the soccer coach of the daughter of a Ware police officer who testified at trial. In answer to the judge's questions, he said he would be impartial in evaluating the testimony of the police witness and knew of no reason why he could not be fair. "Where, as here, the judge, who had the opportunity to observe the prospective juror, makes a determination that the juror is indifferent after exploring the grounds for a possible claim that the juror was not impartial, we cannot conclude, in the absence of any affirmative evidence to the contrary, that the judge abused his discretion." *Commonwealth* v. *Amazeen,* 375 Mass. 73, 83 (1978).

Juror no. 123 was a fire fighter but knew nothing about the case except that the defendant was charged with murder and arson. He said that the charge of arson would not affect his ability to be fair. In *Commonwealth* v. *Ascolillo,* 405 Mass. 456, 460-461 (1989), we declined to "adopt a rule that the mere fact that a prospective juror is a police officer, in the absence of a showing of prejudice or partiality, or connection with the particular facts involved at trial, would form the basis to sustain a challenge for cause." We decline to adopt a comparable rule

where the prospective juror is a fire fighter in an arson case. We conclude that the judge did not abuse his discretion in denying the challenge for cause.

4. *Relief pursuant to G. L. c. 278, § 33E.* We have reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E, and find no error that produced a substantial likelihood of a miscarriage of justice, nor any other reason to order a new trial or to reduce the defendant's murder convictions to a lesser degree of guilt.[11]

*Judgments affirmed.*

---

[11]Because the defendant was convicted of murder in the first degree on the theories of deliberate premeditation, extreme atrocity or cruelty, and felony-murder, the judge did not err in sentencing the defendant on the armed burglary conviction, even though it was a lesser included offense of the felony-murder. In essence, the judge sentenced the defendant to life imprisonment without the possibility of parole on the first two theories, not on the felony-murder theory, so the sentences were not duplicative. See *Commonwealth* v. *Pagan,* 440 Mass. 84, 93 (2003); *Commonwealth* v. *Jackson,* 428 Mass. 455, 467 (1998).