## Commonwealth *vs.* Charles Bockman.

Middlesex. September 10, 2004. - November 12, 2004.

Present: Marshall, C.J., Ireland, Spina, Sosman, & Cordy, JJ.

*Homicide. Jury and Jurors. Practice, Criminal,* Challenge to jurors, Mistrial, Striking of testimony, Request for jury instructions, Capital case.

A criminal defendant charged with murder in the first degree by reason of extreme atrocity or cruelty was not denied a fair trial because the trial judge precluded him from exercising a peremptory challenge on the last of sixteen jurors selected from the panel — which juror the judge later excused for cause on the first day of testimony due to her having been disturbed by the content of the trial — where there was not, nor could there have been, prejudice in that the challenged juror did not sit, but rather the trial proceeded with the remaining fifteen jurors. [761-764]

A Superior Court judge presiding over the trial of an indictment for murder in the first degree by reason of extreme atrocity or cruelty properly declined to declare a mistrial or strike the testimony of a State trooper when he testified on cross-examination to having made a fingerprint identification that had not been disclosed to defense counsel prior to trial, where the judge concluded that the Commonwealth was not under an obligation to disclose this information, because the Commonwealth did not proffer the trooper as an expert on fingerprint identification and did not ask his opinion on the subject. [764-767]

At the trial of an indictment for murder in the first degree by reason of extreme atrocity or cruelty, a Superior Court judge properly refused to instruct the jury on voluntary manslaughter, where there was no evidence introduced from any source at trial that would have warranted the finding of a reasonable doubt as to the existence of provocation in a manner that would have been adequate at law to mitigate the defendant's conduct. [767-769]

Indictment found and returned in the Superior Court Department on October 19, 1999.

The case was tried before *Elizabeth B. Donovan,* J.

*Elaine Pourinski* for the defendant.

*Marguerite T. Grant,* Assistant District Attorney (*Adrienne C. Lynch,* Assistant District Attorney, with her) for the Commonwealth.

CORDY, J. In the early afternoon of August 24, 1999, Norma Bockman was found bludgeoned to death in the kitchen of her Waltham condominium. Her pocketbook, keys, and two CVS Pharmacy bags were clutched in her hands. There were no signs of forced entry or sexual assault. In the living room, the television was on and a cigarette (she did not smoke), which had burned all the way to its filter without being smoked, was in an ashtray on a nearby table. Her husband, the defendant, claimed that he had been out doing errands when the assault occurred, and had returned home to find the gruesome scene. In October, 1999, he was indicted for her murder, and on September 24, 2001, a jury found him guilty of murder in the first degree by reason of extreme atrocity or cruelty.

On appeal, the defendant claims that he was denied a fair trial because the trial judge: (1) precluded him from exercising a peremptory challenge on the last juror selected for the panel; (2) declined to declare a mistrial or strike the testimony of a State trooper when he testified on cross-examination to having made a fingerprint identification that had not been disclosed to defense counsel prior to trial; and (3) refused to instruct the jury on voluntary manslaughter. The defendant also asks the court to exercise its discretionary power under G. L. c. 278, § 33E, to order a new trial or reduce the degree of murder to manslaughter or to murder in the second degree. The claims are without merit, and after a thorough review of the record, we decline to grant relief under § 33E.

1. *Facts.* The jury could have found the following. Although the victim and the defendant had been married for twenty-one years and there was no history of violence between them, there was significant difficulty in their relationship. She had worked at a department store for twenty-five years. He had been unemployed for several months. He was an alcoholic who had been hospitalized for detoxification. She had told friends that she would leave him if he kept drinking. He was interested in more aggressively investing their collective savings and moving to Georgia, and she was not.

By the spring of 1999, the defendant was pursuing relationships with other women, telling them that he was either estranged from his wife or involved in a relationship that would

soon be coming to an end. On the night before the murder, the defendant spoke to a woman he was then seeing, telling her that he had just learned from his financial advisor that his financial resources would be adequate to support her and her children. They then made plans to meet the following night for dinner. She was unaware of the defendant's marriage.

At approximately 9 A.M. on the morning of August 24, the victim and the defendant (dressed in jeans) brought their cat to a veterinary appointment. They left the appointment at 9:14 A.M. and returned home twenty-five minutes later. At approximately noon, a friend and neighbor placed a telephone call to the victim's home. There was no answer. At 2 P.M. this same neighbor left her condominium to bring trash into the dumpster. She waved to the defendant who was just pulling into the parking lot. No more than thirty seconds later he came running across the lot, waving his hands and saying, "Norma's dead, Norma's dead."

The police arrived shortly thereafter. They found the victim lying face down in the kitchen near the rear door leading to a porch and steps down to the parking lot level. She had suffered massive trauma to her head, later determined to be the result of no fewer than fourteen blows from a heavy, blunt, flat object. Expert testimony regarding the pooling of the blood established that the victim had lain where she was found for some time, although the precise time of death could not be determined. The murder weapon was never found.

The defendant accompanied two police officers back to the Waltham police station. He had spots of blood on his T-shirt and shorts, an abrasion on a knuckle on his left hand, blood on his right forearm, and alcohol on his breath. He claimed that after he and his wife had returned home from the veterinarian, he left to do errands, returning at 2 P.M. to discover her body. He told police that the blood on his clothes was his, coming from the abrasion on his finger that he had sustained while in his motor vehicle. He initially claimed that he had not gotten any of the victim's blood on him when he entered the kitchen and found her, but subsequently told police that he had gotten some of her blood on his hands and washed it off in the kitchen sink. He also told police that he had only been in the house for

fifteen seconds, had not entered any rooms other than the kitchen, and had retraced his steps and called to his neighbor. Finally, he provided the police with a chronology of his whereabouts from the time he left the house that morning until his return at 2 P.M.

Testing revealed that the blood on the defendant's clothes was his. The blood on his forearm, however, belonged to the victim, and it was an "impact spatter" the result of blood being projected by some kind of force, not a transfer stain that could have come from touching the body of his wife when the defendant claimed to have found her on the floor. Further investigation of the crime scene led to the discovery of a bloody fingerprint in the living room, near the knob of a door leading to the cellar stairs. The blood was the victim's and the fingerprint was the defendant's. On the cellar floor was a stain of the victim's blood near a tool box. From the cellar there was an exit that led to the backyard.

In his chronology, the defendant claimed that he left the condominium at 10 A.M., going first to the library, then to Mailboxes Etc., and then to the Charles River Internet Center (center) where he spent from 10:30 A.M. to 11:15 A.M. researching job listings on one of its computers. Subsequent police investigation could not confirm his visit to the library, but established that he had been at Mailboxes Etc. (across the street from the library) at 10:47 A.M. By that time he had changed his clothes and was wearing shorts. Surveillance video tape from the center established that he had been present there, but only from 11 A.M. to 11:08 A.M., and that he had written in the center's log book that he arrived at 10:45 A.M. and left at 11:30 A.M. Computer records from the center revealed that, rather than researching job opportunities, the defendant had visited two websites looking for lists of books about Jack the Ripper.

Following his visit to the center, the defendant claimed he bought cigarettes, went to two Alcoholics Anonymous (AA) meetings, and then stopped at a liquor store before returning home. His attendance at the AA meetings was confirmed by witnesses, one of whom noticed that there seemed to be something wrong with the defendant, "like he was in some kind of shock."

Based on this and other evidence, including additional inconsistencies in the defendant's accounts, the Commonwealth argued that the defendant had motive to kill his wife, and in fact did so after returning from the veterinary appointment and before leaving the condominium later that morning.

2. *Jury selection.* The judge decided to empanel sixteen jurors, twelve of whom would eventually be selected to deliberate on the verdict. The defendant and the prosecution were each awarded sixteen peremptory challenges.[1] The process by which the jury were selected included individual voir dire of each venire member on various subjects including their attitudes about alcoholism. Counsel were required to exercise peremptory challenges, if they chose to do so, at the conclusion of each individual voir dire.[2] As the empanelment progressed, and after the defendant exercised peremptory challenges against eight women, the judge, sua sponte, commented that she would start inquiring as to the basis of the defendant's challenges of females. When the defendant challenged a tenth woman, the judge asked counsel for a reason.[3] Although she found the reason to be adequate, the judge warned, "I will excuse this one, but I think you're pretty close." When the defendant subsequently sought to peremptorily challenge an eleventh woman (juror no. 2-3), the judge again requested a justification from counsel, which she did not find credible. The judge then denied the challenge and seated the juror. Juror no. 2-3 was the sixteenth and final juror selected. The jury were sworn and took a view. The trial was adjourned for the weekend.

On Monday morning, the defendant moved for a mistrial based on the denial of his peremptory challenge of juror no. 2-3. The motion was denied and the jury proceeded to hear

---

[1] The number of peremptory challenges provided to parties in a criminal case is governed by Mass. R. Crim. P. 20 (c) (1), 378 Mass. 889 (1979).

[2] This is a permitted practice in trials for murder in the first degree. *Commonwealth* v. *Freiberg*, 405 Mass. 282, 291-292, cert. denied, 493 U.S. 940 (1989).

[3] It is apparent that the judge's request for a reason was prompted by her implicit finding of a pattern of excluding women from the panel by the defendant. See *Commonwealth* v. *Rodriguez*, 431 Mass. 804, 807-809 (2000) (once judge recognized showing of impropriety by finding pattern of excluding women from panel, burden shifted to counsel to provide "group-neutral" reason for challenges).

opening statements and the testimony of several witnesses. During the lunch break, it was reported to the judge that juror no. 2-3 had become very emotional. Questioned by the judge, the juror said she was "having a very hard time with the content of this trial" and had not slept well over the weekend because the voir dire had reminded her of her parents' fights. The judge excused the juror for cause, and the trial proceeded with fifteen jurors on the panel.[4]

The defendant urges us to find that the judge erroneously denied him the use of a peremptory challenge to strike juror sixteen, and to reverse his conviction and order a new trial. The Commonwealth, on the other hand, contends that the court need not decide the correctness of the judge's ruling on the peremptory challenge because the defendant could not possibly have been prejudiced by it in light of the subsequent removal of juror no. 2-3 for cause on the first day of testimony.[5] We agree with the Commonwealth.

Peremptory challenges, "[w]hile not explicitly guaranteed by the Federal Constitution or the Constitution of this Commonwealth," have historically performed an important role in "assuring the constitutional right to a fair and impartial jury." *Commonwealth* v. *Green*, 420 Mass. 771, 776 (1995). They are afforded to a defendant to enable him to eliminate from the jury that will decide his case jurors whom he perceives to be prejudiced against him or who may be "harboring subtle biases with regard to the case, which were not elicited on voir dire or which do not establish legal cause for challenge." *Commonwealth* v. *Soares*, 377 Mass. 461, 483-484, cert. denied, 444 U.S. 881 (1979), quoting 4 W. Blackstone, Commentaries 353 (1807). This court considers the empanelment of an impartial jury so important that it has repeatedly held that the "erroneous disallowance of a peremptory challenge is reversible error without a showing of prejudice." *Commonwealth* v. *Green, supra*, and cases cited. See, e.g., *Commonwealth* v. *Hyatt*, 409

---

[4]After excusing the juror, the judge expressed her view that the motion for a mistrial that she had denied earlier that day was moot. Defense counsel disagreed, arguing, in essence, that if he had been able to exercise his challenge, a different juror would have been seated.

[5]The Commonwealth also argues that the judge's ruling was correct (if we had to reach the merits).

Mass. 689, 692 (1991), *S.C.*, 419 Mass. 815 (1995); *Commonwealth* v. *Wood*, 389 Mass. 552, 564 (1983).

While their purpose and exercise are important, peremptory challenges are only a tool to ensure the seating of an impartial jury and not an end in themselves. *Commonwealth* v. *Jordan*, 439 Mass. 47, 61 (2003). Once juror no. 2-3 was removed for cause, and the trial proceeded with fifteen jurors, there was no juror on the panel against whom the defendant could claim suspected or perceived bias, and no person against whom he had exercised or attempted to exercise a peremptory challenge. The purpose behind the award and exercise of peremptory challenges was fully satisfied.[6]

By so concluding, we do not change the rule that a defendant need not show prejudice when his exercise of a peremptory challenge is erroneously denied and the challenged juror is seated on the panel and participates in deciding the case. "[W]here actual prejudice is impossible to establish and where the right denied is substantial, we . . . reverse[] convictions without requiring a defendant to show actual prejudice." *Commonwealth* v. *A Juvenile (No. 2)*, 384 Mass. 390, 393 (1981). See *Commonwealth* v. *Wood, supra.*

In the case of an erroneous denial of a peremptory challenge, however, the prejudice about which the rule is concerned is that which might flow from the participation of a juror (whom the defendant perceives to be biased) in the deliberations of the jury. What is impossible to establish (at least without violating the secrecy of jury deliberations) is whether the juror in fact harbored subtle biases against the defendant and whether those biases made a difference in the outcome of the case. Our decisions have consistently concluded that so long as the risk of this type of prejudice has been created by an erroneous ruling of the trial judge, it outweighs the normal rule that an aggrieved party bears the burden of showing some actual harm. On the facts of this case, however, that risk became nonexistent. There was not,

---

[6]The defendant had no right to insist that his panel be comprised of sixteen members, or any number of members more than twelve. Just as the judge proceeded with fifteen members after removing juror no. 2-3, the same result would have been reached had she allowed the defendant's challenge to juror no. 2-3 (the last empanelled) and decided not to fill that slot, but to proceed with fifteen jurors.

nor could there have been, prejudice where the challenged juror did not sit.

3. *Fingerprint testimony.* Early in the case the defendant sought discovery of "all reports of scientific tests" performed by the Commonwealth. The Commonwealth agreed to this request in the pretrial conference report filed on March 30, 2001. On the same date, the parties also agreed to reciprocal discovery relating to the expert witnesses each side intended to call. The information to be provided before trial was to include the identity and credentials of each expert; the substance of the opinions or testimony they were expected to give; reports, diagrams, and other materials prepared or used by the experts in forming their opinions; and any similar materials that the experts intended to use at trial.

It was clear that the Commonwealth's case would depend to a significant degree on expert testimony, and the prosecutor proposed to elicit such testimony from experts in the fields of deoxyribonucleic (DNA) testing, blood spatter analysis, and fingerprint examination, among others. Much of the information called for in the agreed-on discovery was exchanged prior to trial, but the defense remained unconvinced that it had received all of the materials to which it was entitled. Just prior to trial, the judge held a hearing on numerous defense motions seeking both additional discovery and the exclusion of the testimony of the Commonwealth's experts on several grounds including its failure to meet the standard of admissibility adopted in *Commonwealth* v. *Lanigan*, 419 Mass. 15, 26 (1994). The judge denied the motion to exclude the expert testimony, and the Commonwealth agreed to provide additional discovery materials (to the extent they existed) sought by the defendant.

In its pretrial filings, the Commonwealth disclosed that it would call State Trooper Karrol Setalsingh to testify about the collection and preservation of fingerprint evidence found at the crime scene (including the bloody print found on the door in the living room) and its delivery to the Federal Bureau of Investigation (FBI) for analysis. In addition, his testimony was to include an opinion that the bloody print was made by a finger that had blood on it, not by a finger that had touched blood that was

already present on the door by some other means.[7] The Commonwealth further disclosed that it would call a fingerprint expert from the FBI latent fingerprint unit to testify regarding the comparison he made between this bloody print and the defendant's fingerprints, and to his opinion that the bloody print matched the defendant's left thumb print. Reports, notes, and other materials regarding the expected testimony of both these prospective witnesses were provided to the defense.

At trial, Setalsingh testified on direct examination consistently with the disclosures made by the Commonwealth. Setalsingh was not asked and did not proffer an opinion about any comparison made between the defendant's fingerprints and the bloody print found at the scene. The issue about which the defendant complains on appeal arose during cross-examination of Setalsingh. Specifically, defense counsel attempted to elicit testimony from Setalsingh as to his familiarity with methods of comparing fingerprints, "[h]ow many matching points on the known print of [the defendant] were available for counting purposes," and "[h]ow many known points of comparison can you make from a clear print." In response to these questions, Setalsingh answered, "It all depends on the print. In this particular instance, I . . . identified ten points of identification." At this point, defense counsel did not move to strike the testimony, but pursued it aggressively, asking whether Setalsingh had "examined the print at the State police laboratory," whether he had revealed the results of his comparison to the FBI (he had not), and whether others at the State laboratory had also examined the print and concluded that it matched the defendant. In response, Setalsingh testified that he and approximately five others at the State police laboratory had examined and identified the print as that of the defendant. Further questioning followed about how many points of comparison the other examiners had found (Setalsingh did not know), and whether there existed an accepted standard as to how many points are necessary to make an identification.

After finishing his cross-examination, the defendant moved

[7]The Commonwealth specifically advised the judge and the defendant at the pretrial discovery hearing that it would not be soliciting an opinion from Trooper Setalsingh regarding any fingerprint comparisons.

that Setalsingh's testimony about the fingerprint comparisons be struck, and that a mistrial be declared because no discovery had been provided with regard to Setalsingh's opinion. The judge denied the motions, concluding that the Commonwealth did not proffer Setalsingh as an expert on fingerprint identification and did not ask his opinion on the subject. Consequently, it was under no obligation to provide the defendant with information concerning the opinion he may have formed.[8]

The FBI expert then testified on direct examination that the print was made by the defendant's left thumb and that he found twelve to fifteen points of comparison. On cross-examination, defense counsel elicited the expert's understanding that personnel at the State police crime laboratory sent the print to the FBI because "they were having trouble making a comparison." In his closing, defense counsel argued that Setalsingh's opinion was not credible because the FBI expert had testified that the State police "had a problem with the print."[9]

The decision to declare a mistrial is within the trial judge's discretion, *Commonwealth* v. *Amirault*, 404 Mass. 221, 232 (1989), and cases cited. In determining whether the judge abused her discretion or committed other error of law in denying the defendant's motion, we look to whether the judge correctly concluded that the Commonwealth was not obligated to disclose information about Setalsingh's opinion regarding the print comparison to the defendant prior to trial. In this case, such an obligation could come from two sources: (1) a discovery order entered by the judge or (2) the Commonwealth's constitutional obligation to disclose exculpatory evidence. See Mass. R. Crim. P. 14 (a) (2), 378 Mass. 874 (1979); *Commonwealth* v. *Bing Sial Liang*, 434 Mass. 131, 135-136 (2001), and cases cited.

With respect to the first source, the judge, who conducted a

---

[8]There was no evidence before the judge that a report of any sort had been prepared by Setalsingh (or anyone else) about the fingerprint comparisons done at the State police laboratory. Notably, defense counsel did not ask that question during his lengthy cross-examination of Setalsingh.

[9]It was apparent, first at the hearing to exclude the Commonwealth's expert testimony and subsequently at trial, that one of the defendant's lines of attack on the fingerprint evidence was to establish (or at least create the impression) that the bloody print was distorted and otherwise unusually difficult to identify, and was sent to the FBI by the State police precisely for that reason.

lengthy hearing on discovery disputes just prior to trial, was in the best position to evaluate whether there had been an actual violation of her discovery orders. Her conclusion that the Commonwealth was not under an obligation to disclose this information is due substantial deference in these circumstances, and there is no basis on which to conclude that it was clearly erroneous.[10] With regard to the second source, there can be little doubt that the information was inculpatory, not exculpatory. The fact that Setalsingh formed an opinion identical to that of the FBI expert — that the bloody print was that of the defendant — but did so on fewer points of comparison, does not rise to the level of exculpatory information. There was no error in the judge's denial of the defendant's motion for a mistrial.

Decisions regarding whether to strike testimony similarly lie within the sound discretion of the trial judge. For the same reason there was no error in denying the motion for a mistrial, there was no error in denying the motion to strike.

4. *Jury instruction.* The defendant sought a jury instruction on voluntary manslaughter. The judge declined to give one. There was no error.

Voluntary manslaughter has been defined as "a killing committed in 'a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat.' " *Commonwealth* v. *McLeod*, 394 Mass. 727, 738, cert. denied sub nom. *Aiello* v. *Massachusetts*, 474 U.S. 919 (1985), quoting *Commonwealth* v. *Hicks*, 356 Mass. 442, 445 (1969). An instruction on voluntary manslaughter is appropriate "if there is evidence of provocation deemed adequate in law to cause the accused to lose his self-control in the heat of passion, and if the killing followed the provocation before sufficient time had elapsed for the accused's temper to cool." *Commonwealth* v. *Andrade*, 422 Mass. 236, 237 (1996), quoting *Commonwealth* v. *Schnopps*, 383 Mass. 178, 180 (1981), *S.C.*, 390 Mass. 722 (1984). "The evidence must be sufficient to cre-

---

[10]Despite the number and complexity of the expert opinions presented, and the concomitant complexity of the expert discovery that preceded trial, it is elementary that the Commonwealth was not required to produce discovery with respect to experts or expert opinions that it did *not* intend to present at trial.

ate a reasonable doubt in the minds of a rational jury that a defendant's actions were both objectively and subjectively reasonable. That is, the jury must be able to infer that a reasonable person would have become sufficiently provoked and would not have 'cooled off' by the time of the homicide, and that in fact a defendant was provoked and did not cool off." *Commonwealth* v. *McLeod, supra.*

The defense in this case was that the defendant was not present when his wife was killed, not that he was provoked in a manner that would be adequate at law to mitigate his conduct. See *Commonwealth* v. *Mendes,* 441 Mass. 459, 475 (2004); *Commonwealth* v. *Cortez,* 438 Mass. 123, 131 (2002). There was no evidence from any source introduced at trial that would have warranted the finding of a reasonable doubt as to the existence of such provocation. In these circumstances, an instruction on voluntary manslaughter was not only unwarranted, it would have been inappropriate. *Commonwealth* v. *Groome,* 435 Mass. 201, 220 (2001) (judge should not give voluntary manslaughter instruction where evidence does not support it).

The defendant contends, however, that the prosecutor suggested the possibility of voluntary manslaughter in her closing argument when she described the killing as a spontaneous act perhaps prompted by something said between the victim and the defendant just before the killing.[11] Consequently, he argues, the judge should have allowed the defendant's renewed request for a voluntary manslaughter instruction. We disagree.

---

[11]Specifically, the prosecutor argued the following:

"The T.V. set is on. Ask yourself, when they came back from the cat hospital, did [the defendant] go in the living room, sit down at the sofa, light up a butt, pack of Winstons right there, that pack of Winstons, the pack of Winstons that was taken in evidence and admitted in evidence? Was [the defendant] sitting there having a cigarette, glasses on the table, remote control and the phone nearby? [The victim], day of errands, standing in the kitchen, holding her keys, has her pocketbook, has the two bags she . . . was trying to decide between the night before. She's got her sunglasses on, and at that moment, did [she] ask [the defendant] a question? Did she say something to him? Did she criticize him to lead him to leave that cigarette burning in the ashtray, leading him to grab a heavy, blunt object of opportunity and to go into that kitchen and not only murder [the victim], but obliterate her?"

First, as the judge properly concluded, closing arguments are not evidence. Second, to the extent that the prosecutor suggested an explanation as to how the crime occurred, she did not suggest anything that would have constituted "reasonable provocation." If words were spoken between the victim and the defendant just prior to the assault, there was no evidence as to their content, and nothing remotely to suggest that they were of such an intensively offensive explosive nature that they could have constituted reasonable provocation. Compare *Commonwealth* v. *Bermudez*, 370 Mass. 438, 441 (1976), and *Commonwealth* v. *Vanderpool*, 367 Mass. 743, 746 (1975) (insulting and offensive words alone cannot provide sufficient basis for reasonable provocation) with *Commonwealth* v. *Schnopps*, 383 Mass. 178, 180-182 (1981) (evidence of sudden admission of adultery equivalent to discovery of act itself, and sufficient evidence of provocation to require manslaughter instruction).

5. *G. L. c. 278, § 33E, relief.* The defendant was well represented by able counsel. There is no accumulation of errors that leads us to conclude that the interests of justice require a reduced verdict or a new trial. Factors that have on occasion led this court to exercise its authority to reduce verdicts in cases involving spontaneous murders between long-standing friends, see, e.g., *Commonwealth* v. *Seit*, 373 Mass. 83, 94-95 (1977), or spouses with otherwise lengthy and trouble-free relationships, see, e.g., *Commonwealth* v. *Dalton*, 385 Mass. 190, 196-197 (1982), are not present here. The defendant had a motive for killing his wife, the killing itself was brutal, and while there had been no history of violence in their marriage, the defendant's volitional conduct leading up to the murder had caused the marriage to be in substantial peril. We decline to exercise our power under G. L. c. 278, § 33E, to reduce the verdict. The defendant's conviction of murder in the first degree is affirmed.

*Judgment affirmed.*