## COMMONWEALTH *vs.* CRAIG SMITH.

Suffolk. October 7, 2011. - February 1, 2012.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, & DUFFLY, JJ.

*Practice, Criminal,* Jury and jurors, Challenge to jurors, Capital case. *Evidence,* Relevancy and materiality, State of mind, Hearsay. *Constitutional Law,* Fair trial. *Homicide.*

At the trial of an indictment charging murder in the first degree, the judge's striking of the defendant's peremptory challenge of a juror did not amount to reversible error, where, given that the juror was designated as an alternate, she did not deliberate in the defendant's case, and therefore the defendant did not face the risk of a juror he perceived as biased against him influencing the verdict. [442-443]

Statement that the "substantial connecting links" doctrine, governing admissibility of third-party culprit evidence at criminal trials, remains a reasonable evidentiary standard that is valid under the Federal Constitution. [445-447]

At a murder trial, the judge properly excluded certain third-party culprit evidence proffered by the defendant, where, given that the evidence did not establish a basis from which to extrapolate any connection to the crimes and failed to provide a rational tendency to prove that unknown individuals, rather than the defendant, committed the crimes, it was of minimal probative value and its admission posed a danger of unfair prejudice to the Commonwealth [447-448]; further, certain hearsay statements contained within the excluded evidence were not admissible under the then-existing mental condition exception to the hearsay rule, where the proffered testimony regarding the victim's state of mind toward unknown third parties had little relevance on the likelihood that such individuals, rather than the defendant, committed the crimes [448-449]; moreover, the excluded evidence did not preclude the jury from assessing the relevance of the victim's relationship with the defendant in considering the defendant's guilt [449].

INDICTMENTS found and returned in the Superior Court Department on March 30, 2006.

The cases were tried before *Frank M. Gaziano,* J.

*Stephen Paul Maidman* for the defendant.

*Anna E. Kalluri,* Assistant District Attorney (*John P. Pappas,* Assistant District Attorney, with her) for the Commonwealth.

CORDY, J. On January 8, 2006, Julio Ceus[1] and Natalie Sumner were shot and killed by two men during a robbery at Julio's apartment in the Allston section of Boston. Two of Julio's roommates, Rony Valcy and Ann Marie Romain, and a visitor, Ashley Bjelf, were also present. Romain and Bjelf sustained no injuries; Valcy was shot twice in his right arm, but survived. Valcy later identified the defendant, who had begun purchasing cocaine from Julio in November, 2005, as one of the assailants.

In March, 2006, the defendant was indicted for the murders and other crimes. On September 27, 2007, he was convicted on the two indictments charging murder in the first degree, on theories of deliberate premeditation with respect to Julio and felony-murder, with armed robbery as the predicate felony, with respect to Sumner.[2]

On appeal, the defendant claims that he was denied a fair trial because the judge disallowed one of his peremptory challenges and barred the third-party culprit evidence he sought to present. The defendant also asks that we exercise our extraordinary power under G. L. c. 278, § 33E, to reverse his convictions and order a new trial. We affirm and conclude that relief under § 33E is not warranted.

1. *Facts.* Because the defendant does not challenge the sufficiency of the evidence, we provide only a summary of it, viewed in the light most favorable to the Commonwealth.

In early 2006, Julio lived in apartment no. 12 of his apartment building with Valcy, Valcy's uncle, Romain, and Romain's son. His brother, Bermane, lived in apartment no. 1 of the same building. Julio had moved into the building so that Bermane could assist him in selling cocaine. When Julio was out of town, Bermane would hold Julio's cocaine for him and sell it to his customers.

The defendant was introduced to Julio in November, 2005, and began purchasing cocaine from him. On December 31,

---

[1]Because Julio Ceus and his brother, Bermane (a witness at trial), share the same surname, we refer to each by his first name.

[2]The jury also found the defendant guilty of assault with intent to murder while armed with a firearm, assault and battery by means of a dangerous weapon, two charges of armed robbery, and two charges of assault by means of a dangerous weapon.

2005, the defendant met Julio to purchase drugs while Julio and his girl friend, Amanda Goodwin, were staying at a hotel near Julio's apartment. The following week, Julio and Goodwin traveled to New Jersey. During this time, the defendant purchased Julio's cocaine from Bermane (at Bermane's apartment) on two occasions.

On Saturday, January 7, 2006, Julio and Goodwin returned to Massachusetts and attended a party, at which the defendant was also present. Julio and the defendant exchanged drugs and money, and all three later went to Julio's apartment. In the defendant's presence, Julio gave Valcy $350 for rent. Because Valcy did not know the defendant, he pretended to put the money into his closet by the bathroom. After a few minutes, the defendant left. Goodwin spent the night at Julio's apartment, leaving the next morning.

That weekend, two women were also staying with Bermane: his girl friend, Sumner; and her friend, Bjelf. Because Bermane was scheduled to work on Sunday evening, the women went upstairs to stay with Julio and spent their time in Julio's bedroom in the rear of his apartment. Some time after Sumner and Bjelf entered the apartment, Valcy and Romain fell asleep in their respective bedrooms.

At 9:06 P.M., Julio received a call from the defendant's cellular telephone to his own cellular telephone. He answered the call and said, "I'll be right there, don't let anyone in." He also said, "When you get to the door, call me," speaking so loudly that he woke Valcy. Two minutes later, Julio received a second call from the same cellular telephone number and said, "I'm coming, I'm coming, I'm coming." He then asked Sumner to answer the door, following her toward the front of the apartment.

A short time later, Sumner returned to Julio's bedroom alone. Bjelf looked down the hallway leading to the bedroom, and saw Julio against the wall with another man facing him. According to Bjelf, the man was black, about six feet tall, stocky, and wearing sunglasses. He proceeded to come down the hallway and into Julio's bedroom, where he pointed a gun at Bjelf and ordered her and Sumner to the floor. They laid face down on the floor next to one another. The man left the room and returned

with Romain, whom he had pulled from her bed in another room, and forced her to lie on a couch in Julio's bedroom.[3]

The man, whom Valcy identified as the defendant, then entered Valcy's room, physically removed Valcy from his bed, and forced him to lie on the floor at the entrance of his bedroom. Julio was lying nearby on the hallway floor. Valcy then observed another man going through a chest of drawers in Julio's bedroom. According to Valcy, that man, who was holding a gun, "seem[ed] to be white," bearded, and approximately five feet, four inches tall.[4]

The defendant, who had taken Valcy's cellular telephone, asked Valcy and Julio for money, which Julio gave him. After handing the money to the other man, the defendant made a hand signal, and the two men started shooting. Julio was shot twice in the head, and Valcy twice in the arm. The men also fired into Julio's bedroom, striking Sumner in the back as she lay on the floor.

After the shooting stopped and the assailants left, Bjelf went to Bermane's apartment. Bermane dialed 911 at 9:23 P.M., and officers responded within minutes. Julio was pronounced dead at the scene; Sumner was taken to a hospital where she later died.

Although no forensic evidence linked the defendant to the murders, the Commonwealth built its case on Valcy's identification of him, records from Julio's and the defendant's cellular telephones,[5] and surveillance footage capturing the defendant's vehicle behind Julio's apartment building just after the murders occurred.[6]

---

[3]Bjelf testified that the man who brought Romain into the bedroom was the same man who had told her to lie on the floor. Romain, however, testified that her assailant had a handkerchief over his mouth and a winter hat on his face, with two holes for his eyes.

[4]This assailant was never identified. However, the Commonwealth requested, and received, a jury instruction on joint venture, enabling the jury to hold the defendant accountable for his own actions, as well as those of the unknown second assailant.

[5]After the murders, the police requested and received records for Julio's cellular telephone number, eventually linking the incoming calls he received just before the murders to the defendant's cellular telephone. The police then used records from the defendant's cellular telephone to track his movements on the night of the murders. Because each call was dispatched through an identifiable cell tower, the police were able to trace the defendant's path from Cambridge, where he lived, to Allston, where Julio and Sumner were killed.

[6]A video surveillance camera was mounted on a building behind Julio's

2. *Peremptory challenges.* The judge decided to empanel sixteen jurors through a process of group questioning and individual voir dire. Both the defendant and the prosecution were entitled to twelve peremptory challenges, and were required to exercise those challenges, if they so chose, at the conclusion of each individual voir dire. As the empanelment progressed, the prosecutor objected to the defendant's use of a peremptory challenge against juror no. 78, arguing that the defendant was improperly excluding white venire members from the jury on account of their race.[7] The judge found that the prosecutor had made a prima facie showing of an improper use of the peremptory challenge, and requested a group-neutral justification from the defendant. He then found that the defendant's proffered reasons for challenging juror no. 78 — that she worked on the reelection committee of the mayor of Boston, that she and her husband were lawyers, and that her nephew was a police officer — were "not legitimate,"[8] struck the challenge, and seated the juror. At the end of trial, this juror was selected as one of two alternate jurors.[9]

The defendant urges us to reverse his convictions on the ground that the judge erroneously denied him the use of a peremptory challenge by seating juror no. 78. Based on our holding in *Commonwealth* v. *Bockman*, 442 Mass. 757 (2004) (*Bockman*), we decline to do so.

In *Bockman*, *supra* at 762, we concluded that a judge did not commit reversible error where she denied a defendant's peremptory challenge of a juror who was later excused from service on

apartment building. After learning that the defendant drove a white Toyota Corolla automobile, the police examined the video and discovered a vehicle matching that description passing by the camera at 9:18 P.M., which was between the time Julio received the calls from the defendant and the time Bermane dialed 911.

[7]The prosecutor had also objected to the defendant's use of a peremptory challenge against juror no. 67 on similar grounds. Although finding that a prima facie showing of a pattern had been made, the judge accepted as group-neutral the defendant's justification that juror no. 67 had raised money for the election campaign of a district attorney and allowed the challenge.

[8]Before reaching this conclusion, the judge asked juror no. 78 whether her work on the mayor's reelection committee would hinder her ability to serve as a juror. She responded in the negative.

[9]After the jury had been empanelled and sworn, the judge excused two of the sixteen jurors because of previously unknown connections to the case.

the first day of testimony. While upholding the long-standing principle that the "erroneous disallowance of a peremptory challenge is reversible error without a showing of prejudice," we recognized that the purposes underlying that principle are only served where the challenged juror actually deliberates in a case. *Id.* at 762-763, quoting *Commonwealth* v. *Green*, 420 Mass. 771, 776 (1995). That is, where a juror that a judge has seated over the defendant's challenge does not participate in deliberations, the defendant does not face the risk of a juror he perceives as biased against him influencing the verdict in his case. *Bockman, supra* at 763.

Although the juror here participated in considerably more of the trial than the *Bockman* juror, her designation as an alternate had the same effect as the *Bockman* juror's dismissal: she did not deliberate in the defendant's case.[10] Because the judge's decision to disallow the defendant's peremptory challenge against juror no. 78 could not amount to reversible error, we need not consider its propriety.

3. *Third-party culprit evidence.* The defendant argues that the judge erred in excluding third-party culprit evidence that he proposed to offer through the testimony of Julio's brother, Bermane; and Julio's girl friend, Goodwin. To assess the admissibility of this evidence, the judge allowed voir dire examinations of the two witnesses during the course of the trial.

The first voir dire was of Bermane. He testified that, a few days before his death, Julio had said that he "ha[d] a problem with a woman" named "Joanne," and that some of her friends,

---

[10]The defendant argues that the jurors engaged in premature deliberation, thus suggesting that juror no. 78 could have influenced the verdicts. To support this contention, he points to an exchange that occurred before juror no. 78 had been selected as an alternate: Juror no. 9 informed the judge that other jurors had spoken of being bored by one of the Commonwealth's witnesses, and she feared the conversation violated the judge's instruction not to discuss the case before the close of evidence. After consulting with counsel for both parties, the judge explained to juror no. 9 that this restriction extended only to substantive matters, and that "passing remark[s] about the pace of the trial" are "a different story." Nonetheless, when the jury convened the next day, the judge reminded the jurors not to discuss substantive matters before the close of evidence. Defense counsel did not object to the judge's handling of this matter.

We agree with the judge that no. juror 9's report did not reflect impermissible deliberation. Moreover, there is no evidence that juror no. 78 even engaged in this conversation among the jurors.

one of whom was a black man, "were looking for [him]." Bermane did not know any details of the problem with "Joanne" nor could he identify her friend. After hearing from both parties, the judge excluded this evidence. Relying on *Commonwealth* v. *O'Brien*, 432 Mass. 578 (2000), he concluded that there were "no substantial connecting links between this mystery person and this crime." He also found that the evidence was "speculative, . . . prejudicial, and [would be] confusing to the jury."

Later in the trial, the judge permitted a voir dire of Goodwin to assess the validity of additional third-party culprit evidence, which, purportedly, would corroborate that of Bermane. Goodwin testified that, in the early morning hours of December 30, 2005 (nine days before the murder), Julio had telephoned her crying and upset. He "talk[ed] about stuff in his past that could catch up to him" and said that he was in a "bad situation." Later that evening, Julio drove to Goodwin's house in Maine.[11]

Goodwin also explained that, on January 7, 2006, she, Julio, and the defendant were together at a party. They had decided that Goodwin would return to Maine and that the defendant would drive Julio home. Julio, however, changed his mind and asked Goodwin to stay with him, which she did. Goodwin then testified that Julio stayed awake all night. He told her that "he didn't feel safe in his apartment" and that he "didn't want anything to happen." On cross-examination by the prosecutor, Goodwin conceded that Julio never specified who or what he feared.

Again referencing *Commonwealth* v. *O'Brien*, *supra*, the judge found this evidence to be "not relevant . . . overly prejudicial, confusing to the jury, and most importantly there's an absence of connecting links between unknown other perpetrators [and] the crime." On that basis, he excluded evidence of the telephone conversation on December 30 and of Julio's sleepless night on January 7. He determined, however, that Goodwin's testimony regarding Julio's willingness to drive with the defendant was independently admissible as evidence of the deceased's state of mind. Therefore, he allowed limited ques-

---

[11]At voir dire, Goodwin also testified that she and Julio saw the defendant for a few minutes at a hotel on December 31, 2005. The judge did not characterize this statement as potential hearsay in his rulings on the third-party culprit evidence, and Goodwin testified to these facts before the jury.

tioning on that point and ruled that Goodwin's observations of interactions between the defendant and Julio were also admissible.

The defendant argues that the judge's exclusion of evidence that Julio feared someone or something from his past was error because the evidence was relevant and would not prejudice the Commonwealth or confuse the jury. He further contends that, as an evidentiary standard, the "substantial connecting links" doctrine denied him his constitutional right to a fair trial and to a meaningful opportunity to present a complete defense. We reject both of these claims.

As we declared in *Commonwealth* v. *Silva-Santiago*, 453 Mass. 782, 800-801 (2009), and repeated in *Commonwealth* v. *Ruell*, 459 Mass. 126, 130-131 (2011) (*Ruell*):

> "Third-party culprit evidence is a 'time-honored method of defending against a criminal charge.' *Commonwealth* v. *Rosa*, 422 Mass. 18, 22 (1996). 'A defendant may introduce evidence that tends to show that another person committed the crime or had the motive, intent, and opportunity to commit it.' *Commonwealth* v. *Lawrence*, 404 Mass. 378, 387 (1989), quoting *Commonwealth* v. *Harris*, 395 Mass. 296, 300 (1985). We have given wide latitude to the admission of relevant evidence that a person other than the defendant may have committed the crime charged. 'If the evidence is "of substantial probative value, and will not tend to prejudice or confuse, all doubt should be resolved in favor of admissibility." ' *Commonwealth* v. *Conkey*, 443 Mass. 60, 66 (2004), quoting *Commonwealth* v. *Keizer*, 377 Mass. 264, 267 (1979). Yet, this latitude is not unbounded. The limitations are twofold. First, because the evidence is offered for the truth of the matter asserted — that a third party is the true culprit — we have permitted hearsay evidence that does not fall within a hearsay exception only if, in the judge's discretion, 'the evidence is otherwise relevant, will not tend to prejudice or confuse the jury, and there are other "substantial connecting links" to the crime.' *Commonwealth* v. *Rice*, 441 Mass. 291, 305 (2004), quoting *Commonwealth* v. *O'Brien*, 432 Mass. 578, 588 (2000). Second, the evidence, even if it is not hearsay, 'must have a rational tendency to prove the issue the defense raises,

and the evidence cannot be too remote or speculative.'
*Commonwealth* v. *Rosa, supra.*"

We recently rejected a challenge under the Federal Constitution to this framework, and discern no reason to revisit that holding in this case. In *Ruell, supra* at 132, we determined that the "substantial connecting links" doctrine is consistent with the "two 'widely accepted' formulations of the evidentiary standard for the admissibility of third-party culprit evidence"[12] recognized by the United States Supreme Court in *Holmes* v. *South Carolina,* 547 U.S. 319, 327 (2006) (*Holmes*).[13] All three formulations "consider whether the third-party culprit evidence tends to prove that someone other than the defendant committed the crime, or whether the evidence is speculative, remote, or lacks any connection with the crime charged." *Ruell, supra.* As such, they serve as a specific application of the "well-established rules of evidence permit[ting] trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes, supra* at 326. In sum, the substantial connecting links doctrine is a reasonable evidentiary standard, which is not " 'arbitrary' or 'disproportionate to the purposes [it is] designed to serve,' " *Commonwealth* v. *McAfee,* 430 Mass.

---

[12]The two formulations are: (1) "Evidence tending to show the commission by another person of the crime charged may be introduced by [the] accused when it is inconsistent with, and raises a reasonable doubt of, his own guilt; but frequently matters offered in evidence for this purpose are so remote and lack such connection with the crime that they are excluded." *Holmes* v. *South Carolina,* 547 U.S. 319, 327 (2006) (*Holmes*), quoting 41 C.J.S., Homicide § 216, at 56-58 (1991); and (2) "[T]he accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged . . . . [Such evidence] may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial." *Holmes, supra,* quoting 40A Am. Jur. 2d, Homicide § 286, at 136-138 (1999).

[13]In *Holmes, supra* at 331, the United States Supreme Court vacated a defendant's convictions where his proffered third-party culprit evidence was excluded because he "could not 'overcome the forensic evidence against him to raise a reasonable inference of his own innocence.' " *Id.* at 324. The Court concluded that this evidentiary standard focused too heavily on the prosecution's evidence when the proper evaluation of third-party culprit evidence analyzes the probative value of the exculpatory evidence and the risk of prejudice or confusion. *Id.* at 326-331.

483, 491 n.3 (1999), quoting *United States* v. *Scheffer,* 523 U.S. 303, 308 (1998), and is valid under the Federal Constitution.[14]

Applying this standard, we conclude that the judge properly excluded the third-party culprit evidence the defendant sought to admit through Bermane and Goodwin. Taken together, the testimony of these witnesses suggest that Julio feared some consequence of his "problem" with "Joanne" or other "stuff in his past," and that these fears manifested themselves in various ways the weekend of his death. Yet, neither Bermane nor Goodwin could identify the individuals whom Julio feared, nor could they — or the defense — establish any ties between these unknown persons and the murders. Julio's fear is insufficient to sustain this burden alone, see, e.g., *Ruell, supra* at 133-134 (affirming exclusion of third-party culprit evidence involving four identified individuals, including evidence that victim was "nervous" around neighbor with criminal record); *Commonwealth* v. *O'Brien, supra* at 588-589 (affirming exclusion of evidence murder victim feared brother-in-law, even though murder victim's brother-in-law appeared at scene of murder and crossed crime scene tape), and the evidence provides no other basis from which to extrapolate a connection to the crimes. Contrast *Commonwealth* v. *Keizer,* 377 Mass. 264, 267-268 (1979) (substantial connecting links between robbery charged and another robbery where both crimes shared distinctive modus operandi, similar identification testimony, and common perpetrator).

The defendant cannot escape the consequence of the vague nature of the proffered testimony. Because it provides scant information about the basis or source of Julio's fears, any links drawn from it to the murders are entirely speculative. For example, it merely assumes, without proving, that the fears Julio expressed to Goodwin were related to the problems Bermane explained, and

[14]The defendant also grounds his constitutional challenge to the substantial connecting links doctrine in art. 12 of the Massachusetts Declaration of Rights, but does not argue that art. 12 affords greater protections than its Federal counterpart in this regard. We have consistently examined a defendant's right to a fair trial and to a meaningful opportunity to present a defense under the Federal and State Constitutions coextensively. See, e.g., *Commonwealth* v. *Perez,* 460 Mass. 683, 688 (2011); *Commonwealth* v. *O'Day,* 440 Mass. 296, 305 (2003); *Commonwealth* v. *Vardinski,* 438 Mass. 444, 449-450 n.11 (2003); *Commonwealth* v. *Curtis,* 388 Mass. 637, 643-644 (1983).

that those "problems" — or any other "stuff in [Julio's] past" — were of such a nature as to motivate murder. Given these flaws, the evidence did not provide "a rational tendency to prove the issue the defense raises," i.e., that the unknown individuals, and not the defendant, committed the crimes. *Commonwealth* v. *Silva-Santiago*, *supra* at 801, quoting *Commonwealth* v. *Rosa*, 422 Mass. 18, 22 (1996). As such, the evidence is of minimal probative value, and its admission would pose a danger of unfair prejudice to the Commonwealth. *Commonwealth* v. *Silva-Santiago*, *supra* ("the admission of feeble third-party culprit evidence poses a risk of unfair prejudice to the Commonwealth, because it inevitably diverts jurors' attention away from the defendant on trial and onto the third party, and essentially requires the Commonwealth to prove beyond a reasonable doubt that the third-party culprit did not commit the crime"). The judge properly weighed these considerations, and correctly deemed the proffered evidence inadmissible.

4. *Hearsay.* The defendant further contends that those portions of the excluded evidence discussed above that convey Julio's apparent fears for his personal safety were admissible under the then-existing mental condition exception to the hearsay rule.[15] We disagree.

The general prohibition on hearsay evidence "interdicts the admission of a statement made out of court which is offered to prove the truth of what it asserted." *Commonwealth* v. *Magraw*, 426 Mass. 589, 594 (1998), quoting *Commonwealth* v. *Qualls*, 425 Mass. 163, 167 (1997). An exception to this rule provides that certain statements "of a person as to his or her present friendliness, hostility, intent, knowledge, or other mental condition are admissible to prove such mental condition." Mass. G. Evid. § 803(3)(B)(i) (2011). See *Commonwealth* v. *Caldron*, 383 Mass. 86, 91 (1981). This exception, however, does not exist in isolation, but, rather, functions within a broader scheme of evidentiary standards. Evidence is not admissible merely because it falls within this — or any other — hearsay exception; it also must be relevant. See Mass. G. Evid., *supra* at § 402 & note at 33. See also *Commonwealth* v. *DelValle*, 443 Mass. 782, 790-793 (2005).

---

[15]The defendant concedes that the reasons for Julio's fear of third parties as conveyed to others constitute hearsay.

Here, the defendant sought to introduce the excluded statements to prove that Julio was afraid of an unknown third party or parties prior to his death. Yet, out-of-court declarations may only be admitted to prove the state of mind of a person where that state of mind is a material issue. *Commonwealth* v. *Cyr*, 425 Mass. 89, 94 (1997). A murder victim's state of mind may only be material in limited circumstances, such as those in which "the defendant opens the door by claiming that . . . the victim would voluntarily meet with or go someplace with the defendant, or that the defendant was on friendly terms with the victim," or where the "the defendant knew of the victim's state of mind and . . . 'would be likely to respond to it.' " *Commonwealth* v. *Magraw, supra*, quoting *Commonwealth* v. *Qualls, supra*. "However, evidence of a victim's fear of the defendant is not admissible at all to prove motive." *Commonwealth* v. *Magraw, supra*. See *Commonwealth* v. *Cyr, supra* at 93, and cases cited.

The proffered testimony does not speak to any of these circumstances; it is focused on Julio's state of mind regarding unknown third parties, not the defendant. Further, there is no indication that these unknown persons knew that Julio feared them, nor would his fear be admissible to prove that they had motive to kill him. The evidence, then, provides little relevant insight into the likelihood that such individuals, and not the defendant, committed the crime.

Further, evidence of Julio's state of mind regarding the defendant was presented to the jury. The judge allowed testimony that Julio appeared comfortable around the defendant, was willing to travel in a car with him, and had attended a party with him. The judge also permitted testimony that, when Bermane provided a detective with the defendant's cellular telephone number, Bermane referred to the defendant as "Julio's best friend." The jury, then, were in no way precluded from assessing the relevance of Julio's relationship with the defendant in considering the defendant's guilt. They were merely prohibited from considering evidence that had no bearing on that inquiry.

5. *Review pursuant to G. L. c. 278, § 33E.* We have conducted a thorough review of the record in accordance with G. L.

c. 278, § 33E, to determine whether there is any basis to set aside the verdicts of murder in the first degree or order a new trial, regardless of whether such grounds were raised on appeal. We conclude that there is not.

*Judgments affirmed.*